UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:CR-22-061-01 |
| | : | |
| v. | : | (Judge Mariani) |
| | : | |
| DAVON ANTHONY BECKFORD, | : | (Electronically Filed) |
| a/k/a "Dolo," a/k/a "Jaquan Wilson," | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PSR

Respectfully submitted by:

GERARD M. KARAM
United States Attorney

*/s/ Michelle Olshefski*
MICHELLE L. OLSHEFSKI
Assistant United States Attorney

# TABLE OF CONTENTS

Table of Authorities ............................................................................ ii

Background ........................................................................................... 1

Argument ............................................................................................ 10

    A.  The PSR Reports the Correct Base Offense Level of 43 ................. 10

    B.  Beckford Was an Organizer or Leader of Criminal Activity
        Involving Five or More Participants or was Otherwise Extensive .... 19

    C.  Beckford's Prior New York Violent Felony Conviction for Armed
        Robbery of the First Degree Qualifies as a Crime of Violence for
        Career Offender Purposes ................................................................ 28

Conclusion ........................................................................................... 36

Word Count .......................................................................................... 37

Certificate of Service ........................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*Lassend v. United States*, 898 F.3d 115 (1st Cir. 2018) .................................. 35

*Stuckey v. United States*, 878 F.3d 62 (2d Cir. 2017) ..................................... 35

*United States v. Aguilar–Pereira,*

     No. 00–20893, 2001 WL 1075898 (5th Cir. Aug. 23, 2001) .................. 11

*United States v. Allen* 208 F. App'x. 189 (2006) ............................................ 33

*United States v. Banks*, 770 F.3d 346 (5th Cir. 2014) .............................. 10, 11

*United States v. Bethancourt,* 65 F.3d 1074 (3d Cir. 1995) ........................... 20

*United States v. Carrington*, 2023 WL 1990529 (E.D. VA 2023) .................. 16

*United States v. Chau,* 293 F.3d 96 (3d Cir. 2002) ........................................ 20

*United States v. Cruz Camacho*, 137 F.3d 1220 (10th Cir. 1998) ................. 20

*United States v. Cuello,* 357 F.3d 162 (2d Cir. 2004) .................................... 32

*United States v. Driskell,* 277 F.3d 150 (2d Cir. 2001) .................................. 31

*United States v. Fisher* 683 Fed. App'x 214 (4th Cir. 2017) ................... 15, 16

*United States v. Hammond*, 912 F.3d 650 (4th Cir. 2019) ............................ 36

*United States v. Helbling*, 209 F.3d 226 (3d Cir. 2000) ................................. 19

*United States v. Jackson* MDPA 3:cr-20-291 ................................................. 14

*United States v. Johnson* 706 F.3d 728 (6th Cir. 2013) ............... 14, 15, 16, 17

*United States v. Jones,* 415 F.3d 256 (2d Cir. 2005) ................................ 29, 32

*United States v. Katora,* 981 F.2d 1398 (3d Cir. 1992) ................................. 20

*United States v. Marshall,* 910 F.2d 1241 (5th Cir.1990) ............................. 11

*United States v. Moorer,* 383 F.3d 164 (3d Cir.2004) .......................... 33, 34, 35

*United States v. Ojeda,* 951 F.3d 66 (2d Cir. 2020) ....................................... 35

*United States v. Parnell*, 524 F.3d 166 (2d Cir. 2008).................................... 32

*United States v. Pereira–Gomez*, 903 F.3d 155 (2d Cir. 2018) ...................... 35

*United States v. Reinoso,* 350 F.3d 51 (2d Cir.2003) ..................................... 31

*United States v. Rosario*, MDPA 3:-cr-21-206................................................ 14

*United States v. Sanchez*, 940 F.3d 526 (11th Cir. 2019) .............................. 36

*United States v. Sica,* 676 Fed. App'x 81 (2017) ........................................... 16

*United States v. Stevens*, 2022 WL 1297091 (E.D. Kentucky, 2022) ............ 16

*United States v. Wallace*, 663 F.3d 177 (3d Cir. 2011)....................... 33, 34, 35

*United States v. Westry,* 524 F.3d 1198 (11th Cir. 2008) .............................. 16

*United States v. Wright*, 109 F. App'x 510 (3d Cir. 2004).............................. 33

*United States v. Zayas*, MDPA 3:cr-16-222.................................................... 14

# I.   Background

On March 1, 2023, Davon Beckford appeared before the Court and pleaded guilty to Count 2 of the Indictment, which charges him with the unlawful distribution of controlled substances resulting in death, in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(C).  (Doc. 1).  Beckford entered his guilty plea pursuant to the terms of a written plea agreement.  (Doc. 77).  The factual basis for Beckford's plea of guilty included his admission that on or about February 12, 2021, he knowingly, intentionally and unlawfully distributed a mixture and substance containing a detectable amount of fluorofentanyl, a Schedule I controlled substance analogue as defined in 21 U.S.C. § 802(32), with intent for human consumption as provided in 21 U.S.C. § 813, and death and serious bodily injury of a person resulted from the use of such substance.  Beckford admitted that **as a result of his drug trafficking enterprise** headquartered in Arizona, from which he distributed controlled substances to multiple subordinate drug dealers located within the Middle District of Pennsylvania and elsewhere, Michaelena Kowalczyk died.

Beckford specifically admitted that on or about February 12, 2021, he utilized the U.S. Postal Service to mail a quantity of fluorofentanyl pills obtained in Arizona to a local drug dealer, Akee Miller, a/k/a "Mitch," for further distribution within the Middle District of Pennsylvania.  Beckford admitted that Kowalczyk died as a result of ingesting one of the pills sold by

him to Akee Miller.  Beckford admitted that but for his unlawful drug distribution on or about February 12, 2021, Michaelena Kowalczyk would not have died.

The overall criminal network organized and overseen by Beckford must be described in order for the full import of Beckford's relevant conduct to be understood and appreciated.[1]

Michaelena Kowalczyk's death involved the ingestion of just one fluorofentanyl pill sold to her by Akee Miller on February 17, 2021. Toxicology at autopsy evidenced a fluorofentanyl death.  Three (3) pills taken from the scene of the death were laboratory tested and determined to be fluorofentanyl, a fentanyl analogue and a Schedule I controlled substance.

---

[1]  Section 1B1.3 of the guidelines sets forth the rules governing **relevant conduct**. That section provides, as pertinent here, that relevant conduct includes:

**(1) (A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

**(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

**(i)** within the scope of the jointly undertaken criminal activity,

**(ii)** in furtherance of that criminal activity, and

**(iii)** reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; U.S.S.G. § 1B1.3(a)(1)(A), (B).

Akee Miller pleaded guilty to his role in the drug distribution that resulted in the death of Kowalczyk and awaits sentencing.[2]

As law enforcement's investigation continued beyond the apprehension of Akee Miller, it was learned that Miller was but one of Beckford's many drug subordinates located in the Middle District of Pennsylvania. It was learned that after completing a sentence for a federal supervised release violation on November 30, 2019, Beckford and co-conspirator, Tyla Griffin, relocated to Arizona.[3] There, at least initially, Griffin assisted Beckford in obtaining large quantities of fentanyl pills for further distribution to known drug subordinates who continued to reside in Pennsylvania and elsewhere. From approximately January 2020 through January 2021, Beckford and Griffin lived and worked together in Arizona to distribute fentanyl pills. Sometime in January 2021, Beckford and Griffin separated from each other, but each continued to distribute fentanyl pills from Arizona via the U.S.

---

[2] On June 7, 2021, Akee Miller appeared before the Court and pleaded guilty to a one-count criminal information charging him with a violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(C), and 18 U.S.C. §2. (3:CR-21-150, Doc. 2). Miller is scheduled to be sentenced on April 16, 2024.

[3] Beckford was released from federal custody and his federal case was closed on November 30, 2019. *See* 3:CR-16-127-05, PSR ¶ 43. Tyla Griffin appeared before the Court on February 28, 2023 and pleaded guilty to Count 1 of the Indictment, a violation of 21 U.S.C. § 846, Conspiracy to Possess and Distribute a Controlled Substance (fentanyl). (Doc. 65). She awaits sentencing.

Postal Service to Pennsylvania and elsewhere. Prior to the separation, Akee Miller obtained quantities of fentanyl pills from both Beckford and Griffin.

When Miller ordered up the pills from Beckford that caused the death of Kowalczyk in February 2021, he did what he had been doing for some time. When Miller needed to resupply the pills, he would contact Beckford on Facetime or on Telegram (social media apps). After Miller placed his order, he would electronically transmit cash to Beckford. At times, one of Beckford's associates located in the Middle District of Pennsylvania, most often Kasey Sanchez, would contact Miller to pick up Miller's money and electronically transmit the cash to Beckford on Miller's behalf.[4] Only after the money was electronically transmitted to Beckford and confirmed to be in one of his accounts would Beckford package up the pills and send the "order" via the U.S. Postal Service. From time to time, the "order" would be sent to one of Beckford's associates residing in Pennsylvania, who would then deliver the order to Miller. Sometimes Beckford would send the order to an abandoned house somewhere in Wilkes-Barre and Miller would have to wait and secure

---

[4] Beckford utilized coconspirators from time to time to electronically transmit cash in his/her name via Cash App or Zelle to him in Arizona on behalf of Beckford's other coconspirators in Pennsylvania. The transmission of so much cash caused issues for Beckford because both Cash App and Zelle had limiting thresholds regarding the transmission of cash within a particular time period. To get around the thresholds, Beckford recruited accomplices to assist with the transmission of cash. Beckford's other coconspirators found different ways around the thresholds.

the package.  Beckford typically disguised the pills within children's art supplies inside the postal envelope.  Miller became part of the Beckford/Griffin conspiracy in the late Spring of 2020 when Beckford recruited him by fronting him approximately 20 pills to sell.  Thereafter, Beckford typically charged Miller $5 per pill and Miller sold the pills individually for $30 per pill, or at a discount if multiple pills were purchased.  It has been reported that on a few occasions when Miller complained to Beckford about the quality of the pills, Beckford stated that his "people" in Pennsylvania like the pills, causing Miller to believe that Beckford was distributing pills to others in Pennsylvania from Arizona in similar fashion.

Regarding the pills Miller obtained from Beckford and later sold to Kowalczyk resulting in her death, Miller received that delivery from Beckford approximately one week prior to the death.  Facebook communications, electronic cash transmittals, and cooperating witness testimony prove that Miller purchased pills from Beckford via Kasey Sanchez which were delivered to Sanchez on February 12, 2021.  After Sanchez transferred the package to Miller, Kowalczyk made her purchase from Miller in the evening of February 17, 2021 and was found deceased on February 18, 2021.  Miller typically purchased several hundred pills per order.

Beckford utilized more than one associate in Pennsylvania to transmit cash to him from his many subordinate dealers, and/or receive packages from

Beckford to be turned over to his subordinate dealers. Kasey Sanchez was one of Beckford's subordinates who electronically transmitted cash to Beckford on behalf of subordinate dealers and also received packages sent from Arizona by Beckford to her Pennsylvania address to be turned over to the Pennsylvania dealers.[5] In exchange for doing this, Beckford paid Sanchez cash and also provided her with pills.

Mercedes Smith is another of Beckford's coconspirators. During the course of the conspiracy and at the direction of Beckford, Smith electronically transmitted approximately $130,000 to Beckford in Arizona on behalf of Beckford's Pennsylvania drug dealers.[6]

As the investigation continued, law enforcement learned from a confidential source of information that Beckford was scheduled to fly from Arizona to Pennsylvania on February 6, 2022. The source reported that

---

[5] Kasey Sanchez appeared before the Court on June 13, 2023 and pleaded guilty to Count 1 of the Indictment, a violation of 21 U.S.C. § 846, Conspiracy to Possess and Distribute a Controlled Substance (fentanyl). (Doc. 66). She awaits sentencing.

[6] On September 20, 2023, Mercedes Smith pleaded guilty to her role in the conspiracy involving a violation of 21 U.S.C. § 846, Conspiracy to Possess and Distribute a Controlled Substance (fentanyl). (3-CR-23-26-08, Doc. 267). She awaits sentencing before U.S. District Judge Malachy E. Mannion.

Beckford was bringing 1,000 fentanyl pills with him for sale to a Wilkes-Barre subordinate.[7]

Law enforcement later confirmed that Beckford had arrived in Wilkes-Barre as planned and was scheduled to return to Arizona on February 9, 2022 from the Wilkes-Barre/Scranton Airport. Surveillance units observed Beckford enter the airport and check in at the American Airlines counter. Beckford then proceeded through TSA security and was approached by investigators after being cleared by TSA. Investigators escorted Beckford to an office away from other passengers and placed him under arrest. Investigators conducted a search of Beckford's person and secured his Apple I-Phone, a fanny pack which contained a large amount of U.S. Currency ($9,140 cash), and Beckford's Arizona driver's license. Only after conducting a full forensic analysis of Beckford's cellular device was the full scope of his criminal enterprise discovered. Beckford's cellular device was replete with the identities of drug subordinates to whom Beckford had been supplying large quantities of fentanyl pills on a regular basis. Beckford's cellular device contained thousands of text communications between him and more than a

---

[7] Law enforcement later confirmed that Beckford indeed traveled from Arizona to Pennsylvania with approximately 1,000 fentanyl pills and sold most or all of those fentanyl pills to another drug subordinate and coconspirator, Rahmel Wigfall, a/k/a "Inf," located in Wilkes-Barre.

dozen Pennsylvania drug dealers. Beckford's cellular device contained hundreds of images of U.S. Postal tracking receipts confirming that upon receipt of cash electronically transmitted to him, Beckford packaged up large quantities of fentanyl pills and mailed the pills to drug dealers in Pennsylvania. Law enforcement was able to determine that the more pills purchased in a single order, the better the price Beckford charged per pill. Tens of thousands of pages of financial documents obtained by law enforcement also confirmed the extremely lucrative and large scale drug distribution enterprise managed and directed by Beckford. In fact, evidence seized in relation to Beckford's arrest resulted in another 15-defendant indictment docketed at 3:23-CR-26.[8] Indeed, Beckford's cellular device was his "office" from which he managed his criminal enterprise.

To his credit, Beckford accepted responsibility for his crimes and pleaded guilty as stated above. Following entry of his guilty plea, a presentence report was prepared. That report concludes that Beckford's base offense level is 43, pursuant to U.S.S.G. §2D1.1(a)(1).[9] Beckford has filed

_____

[8] Case 3:23-CR-26 is assigned to U.S. District Judge Malachy E. Mannion.

[9] The First Step Act amended four of the six penalty provisions referenced in §2D1.1(a)(1) and, for those amended provisions, the term "similar offense" is over-inclusive, because it includes drug offenses that do not meet the definition of "serious drug felony," and under-inclusive, because it fails to account for a prior "serious violent felony." The amendment divides

objections to the PSR, which include an objection to this base offense level. Because the Government has agreed <u>not</u> to seek a **mandatory life sentence** for Beckford, the Government agreed to withdraw a previously filed Information of Prior Convictions pursuant to 21 U.S.C. Section 851 prior to sentencing. Beckford now argues that a withdrawal of the Section 851 Information reduces the base offense level to 38.  Beckford also argues that the four-level enhancement for his role in the offense should not be applied, and that his prior New York felony conviction for armed robbery of the first degree should not qualify as a felony conviction much less a crime of violence for career offender purposes.

For all of the reasons stated below, Beckford's objections should be overruled.  His objections are contrary to law and the facts of this case.

---

§2D1.1(a)(1) into two subparagraphs, (A) and (B). Subparagraph (A), which references the four statutory provisions amended by the First Step Act, replaces the term "similar offense" with "serious drug felony or serious violent felony." **Subparagraph (B), which references the two provisions that were not amended, replaces the term "similar offense" with "felony drug offense."** The amendment also amends §2D1.1(a)(3), by replacing the term "similar offense" with "felony drug offense," for consistency with the terminology used in §2D1.1(a)(1).  **The effective date of this amendment is November 1, 2023.**

II.    <u>Argument</u>

Notably, the PSR correctly concludes that the defendant is a career offender pursuant to U.S.S.G. §4B1.1(b) based on one prior felony drug offense conviction and one prior conviction for a crime of violence, detailed in paragraphs 42, 44, thereby exposing the defendant to greater punishment **under the guidelines**.  PSR §45.  Beckford's criminal history category is properly calculated at VI.  The PSR correctly concludes that his guideline sentencing range is life, after acceptance of responsibility.  PSR ¶64.  This range is **correctly premised** on Beckford's status as a career offender, a base offense level of 43, as well as the applicable enhancements.

A.  <u>The PSR Reports the Correct Base Offense Level of 43</u>.

In support of his objection to the base offense level, Beckford argues **with no support** that, "USSG §2D1.1(a)(1) is essentially the Sentencing Commission's identical counterpart to an increased punishment stated in 21 U.S.C. §841."  (Doc. 150 at 3).  There is absolutely no support for this claim, nor does Beckford offer any.  In fact, the sole case cited by Beckford, *United States v. Banks*, 770 F.3d 346, 350 (5th Cir. 2014), actually supports the Government's position.  The defendant in *Banks* argued that his plea agreement precluded him from being sentenced as a career offender under the Guidelines.  In *Banks*, the Government promised in the defendant's plea agreement that it would "not pursue a sentence enhancement under Title 21,

United States Code, Section 851." *Banks*, 770 F.3d at 350. Banks apparently

understood that promise to mean that he would not be sentenced as a career

offender under § 4B1.1 of the Guidelines. The Court, however, stated and

held that,

> "But section 851 has **nothing to do** with § 4B1.1 of the Sentencing
> Guidelines. Rather, it lays out the procedure for proving prior
> convictions that can be used to trigger the ***statutory*** sentencing
> enhancements available under 21 U.S.C. § 841(b((1)(A). *United
> States v. Marshall,* 910 F.2d 1241, 1244–45 (5th Cir.1990);
> *United States v. Aguilar–Pereira,* No. 00–20893, 2001 WL
> 1075898, at *1 (5th Cir. Aug. 23, 2001) (unpublished). These
> statutory sentencing enhancements triggered by prior convictions
> are substantial, and, given that Banks had prior cocaine
> convictions (according to the Presentence Investigation Report),
> the Government's waiver of these provisions was certainly of
> some value to Banks. *See* 21 U.S.C. § 841(b)(1)(A)(viii) ("If any
> person commits such a violation after a prior conviction for a
> felony drug offense has become final, such person shall be
> sentenced to a term of imprisonment which may not be less than
> 20 years and not more than life imprisonment...."). As such,
> Banks's plea agreement does not foreclose application of § 4B1.1,
> but **speaks only to the statutory sentencing enhancements under
> section 851**.

*Id.* at 350 (emphasis added). The reasoning of the Court in *Banks* is

consistent with and equally applicable in this case as argued by the

Government in that an Information of Prior Convictions pursuant to § 851

has no applicability to the Guidelines. Thus, Beckford's reliance on *Banks* is

misplaced.

It is the Government's position that the appropriate base offense level

to be applied to Beckford's offense of conviction is **43**. The Government's

position is based on Beckford's admissions of guilt and his prior similar felony drug offense.  Despite the November 1, 2023 amendments to §2D1.1(a) as noted in fn 1, Beckford's criminal history and offense of conviction still correctly place him at a base offense level of 43.

The filing of a section 851 Information serves only as notice to the defendant under the **statutory structure of Title 21** that the Government intends to increase the **statutory penalties** associated with the defendant's crimes and has **no applicability to the guidelines when no statutory penalties are increased,** nor has any authority been identified in support of a Section 851 notice requirement pursuant to §2D1.1(a)(1)'s guideline base offense levels.  The Government is unaware of any such authority.  Here, the withdrawal of a section 851 Information serves only to remove the **mandatory sentence of life** for Beckford's crimes.[10]  Application of the appropriate base offense level in this case does **not** impact the mandatory minimum or maximum statutory penalty for the crime to which Beckford plead guilty.  As such, the statutory penalties are **_not_** increased by application of the appropriate base offense level.  Moreover, a section 851 Information plays no

---

[10]    It is noted that the defendant does not dispute the fact that he has been previously convicted of a felony drug offense that permits the Government to lawfully seek a mandatory life sentence with the filing of an Information of Prior Convictions Involving Controlled Substances pursuant to 21 U.S.C. § 851.

role in establishing "a similar offense," or now a similar "felony drug offense," under the sentencing guideline §2D1.1(a)(1).

By way of example, a section 851 Information is **not required** in order to implicate a defendant's **career offender designation** under the guidelines pursuant to U.S.S.G. §4B1.1, which is a designation that subjects a defendant to greater punishment **under the guidelines**. Indeed, a career offender designation subjects a defendant to an increased guidelines score with no requirement for filing of a section 851 Information. Beckford has been properly designated a career offender in this case without the filing of a section 851 Information. PSR ¶45. If in fact a section 851 Information is filed in a career offender situation, it would serve as notice that the maximum statutory penalty could increase, but there is **no requirement** for a section 851 Information to be filed for a career offender designation. Nor does a section 851 Information have to be included in a plea agreement or in a charging document. That is simply not the law.

Therefore, Beckford's assertion that withdrawal of a section 851 Information automatically reduces the base offense level to 38 in this case is misplaced and legally incorrect. The same is true regarding any claim that in order for application of §2D1.1(a)(1)'s base offense level of 43, Beckford's prior felony drug conviction must have been included in the plea agreement or charging document. That is simply not the law.

The law requires that for application of a base offense of 43 pursuant to §2D1.1(a)(1)(B), the defendant must have committed the instant offense of conviction (here, drug distribution resulting in death) after one or more prior convictions for a similar offense (now felony drug offense). **That is all the law requires.** Beckford has the one required prior felony drug offense as set forth in the PSR at ¶ 44 which correctly places him at a base offense level of 43. *See* §2D1.1(a)(1)(B). Beckford does not and cannot dispute the fact of the required prior felony drug offense. To the extent Beckford claims that any prior felony drug offense must exactly match the offense of conviction, *i.e.* resulting in death, he is wrong. Any such claim has been consistently rejected by federal courts, including this Court.[11]

This argument was rejected by the Sixth Circuit in *United States v. Johnson* which held that "the term 'similar offense' is synonymous with the term "felony drug offense" for purposes of interpreting U.S.S.G. §2D1.1(a)(1)". 706 F.3d 728,733 (6th Cir. 2013). The Sixth Circuit reasoned:

> Notably, although USSG § 2D1.1(a)(1) uses the term "similar drug offense" and 21 U.S.C. § 841(b)(1)(C) uses the term "felony drug offense," the guideline and statute mirror one another in several respects. The statute provides that a defendant will be subject to a maximum statutory sentence of thirty years if the

---

[11]  *See, e.g. United States v. Zayas*, MDPA 3:cr-16-222 (BOL = 43 similar offense(s) did not involve prior death);  *United States v. Jackson* MDPA 3:cr-20-291 (BOL = 43 similar offense(s) did not involve prior death); *United States v. Rosario*, MDPA 3:-cr-21-206 (BOL=43 similar offense(s) did not involve prior death).

instant controlled substance offense was committed "after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(C). However, "if death or serious bodily injury results from the use of such substance," the defendant will face a sentence of life imprisonment. *Id.* Thus, both the guideline provision and the statute contemplate sentencing a defendant to a term of life imprisonment if he has committed a controlled substance offense that resulted in death or serious bodily injury and has a prior conviction. In fact, USSG § 2D1.1(a)(1) merely reinforces the enhanced penalty **mandated by statute**. Taking into account the plain language of both the guideline provision and the statute, we conclude that the Sentencing Commission intended the term "similar offense" to be synonymous with the term "felony drug offense."

*Id.* at 731 (emphasis added).

The Government also notes that in *Johnson*, the Court rejected the defendant's claim that the Government needed to file a section 851 Information for a base offense level of 43. 706 F.3d at 732. The Court stated:

Section 851 ensures that defendants are provided certain procedural safeguards before receiving a **mandatory sentence enhancement** on the basis of a prior conviction. Once those requirements have been satisfied, those defendants are subject to an enhanced sentence. Johnson offers no authority to the contrary. Here, the only reason Johnson was not subject to the **statutory mandatory minimum sentence** was because the Government did not file an information pursuant to § 851, in accordance with the terms of Johnson's plea agreement. Notwithstanding the terms of Johnson's plea agreement, the district court was still permitted to take into account Johnson's prior felony drug conviction when determining whether to apply USSG § 2D1.1(a)(1).

*Id.* (emphasis added).

Similarly, the Fourth Circuit explained in *United States v. Fisher* that:

> The Guidelines do not require that the offenses involve identical
> controlled substances, but only that the offenses be similar. See
> USSG § 2D1.1(a)(1) ("defendant committed the offense after one
> or more prior convictions for a similar offense"). Next, the
> offenses are similar in that the intent in both involved
> distribution of controlled substances. *See United States v.
> Johnson,* 706 F.3d 728, 733 (6th Cir. 2013) (similar offense is
> synonymous with "felony drug offense"); *United States v. Westry,*
> 524 F.3d 1198 (11th Cir. 2008) (conviction for possession of
> pentazocine similar offense to conspiracy to possess with intent to
> distribute several types of controlled substances). Finally, Fisher
> alleges that the marijuana conviction did not involve death. The
> fact that the prior conviction did not involve serious bodily injury
> or death is irrelevant because 21 U.S.C. § 841(a) (2012)
> prescribes the unlawful act and 21 U.S.C. § 841(b)(1)(C) (2012)
> only prescribes the penalty, which takes into consideration
> whether serious bodily injury or death resulted from the unlawful
> act. We therefore conclude that the court did not err in applying
> the enhancement in USSG § 2D1 .1 (a)(1 ).

683 Fed. App'x 214, 215 (4th Cir. 2017).[12]

---

[12]    Similar to *Johnson*, **no section 851 Information was filed** in *Fisher*.
683 Fed. App'x 214 (2017). *See also*, *United States v. Sica,* 676 Fed. App'x 81
(2017), no plain error in applying sentencing guideline imposing base offense
level of 43 for defendant on ground that he had prior convictions for similar
offense, even though he **did not plead** to the substantive prior-felony death-
results crime and **no §851 Information filed**; *United States v. Stevens*, 2022
WL 1297091 (E.D. Kentucky, 2022) (Federal Probation Officer responded in
addendum to PSR that defendant's prior 2000 conviction for first degree
possession of a controlled substance (crack cocaine), a class D felony under
Kentucky law, qualified as a "similar offense" for purposes of §2D1.1(a)(1).
The Court agreed that *Johnson* was "on point" because "similar offense" is
synonymous with "felony drug offense" and defendant had prior drug offense
and **no §851 Information filed**; *United States v. Carrington*, 2023 WL
1990529 (E.D. VA 2023) (defendant's base offense level properly calculated at
43 even though Virginia offense not precise match, it is nonetheless "similar"
to the federal statute and **no §851 Information filed**.

*Johnson's* primary holding is that "the term 'similar offense' is synonymous with the term 'felony drug offense'" as used in 21 U.S.C. §841(b)(1)(C). *Johnson*, 706 F3d at 733. As detailed in fn 1 above, the Guidelines Amendment, effective November 1, 2023, amended §2D1.1(a)(1) by replacing the term "similar offense" with "felony drug offense," in Subparagraph (B) of §2D1.1(a)(1).

Beckford has at least one prior felony drug offense and **only one** is necessary to place him at a base offense level of 43.

Beckford was previously convicted on or about May 13, 2019 in Luzerne County Court of Common Pleas of Possession With Intent to Deliver Controlled Substances (heroin and crack), in violation of 35 § 780-113 §§A30, which is a felony drug offense. (Case No. CR-1394-2018). At the time he committed that drug trafficking offense, he was still on federal supervision for a previous federal drug trafficking crime. (Case No. 3:CR-16-127). The Luzerne County felony drug conviction resulted in a revocation of supervised release and Beckford was resentenced to an additional term of 6 months imprisonment. PSR ¶ 43. It is upon completion of this supervised release violation that Beckford relocated to Arizona where he continued in his drug trafficking business - but on a larger scale. Beckford's Luzerne County 2019

felony drug conviction carries a statutory maximum greater than 1 year imprisonment in Pennsylvania and qualifies as felony drug offense. *See* 35 P.S. Sec. 780-113(f)(1).

For purposes of the U.S.S.G., "felony drug offense" has the meaning given that term in 21 U.S.C. §802.

"**Felony drug offense**" means:

> an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or Foreign county that prohibits or restricts conduct relating to **narcotic drugs, marijuana**, anabolic steroids, or depressant or stimulant substances.

21 U.S.C. § 802(44) (emphasis added).

There is no doubt that Beckford's prior Luzerne County felony drug offense involving possession with intent to distribute heroin and crack cocaine qualifies as a "felony drug offense" and **only one** is necessary for proper application of U.S.S.G. §2D1.1(a)(1). Beckford's prior felony drug offense is punishable by more than a year "under any law of the United States" and the Pennsylvania statutes prohibit "conduct relating to narcotic drugs, marijuana, ……" *See* 21 U.S.C. § 802(44).

For all of the above stated reasons, Beckford's base offense level is properly calculated at 43 and the PSR accurately reflects the same. PSR ¶40.

### B. Beckford Was an Organizer or Leader of Criminal Activity Involving Five or More Participants or was Otherwise Extensive

Beckford objects to the application of the 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a). In support of his objection, Beckford has applied an incorrect interpretation of the leadership enhancement. He claims that by his counting, even giving the benefit of the doubt to the Government, his leadership was limited to only 4 participants. (Doc. 150, p. 5-6). Beckford is wrong in his understanding of this sentencing enhancement. Beckford's narrow view of his criminal enterprise must also be rejected.

The commentary to § 3B1.1 does not define "organizer or leader" but lists factors for sentencing courts to consider in determining whether a defendant qualifies as such. Those factors include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *Id.* cmt. n.4. "We have explained that to be considered an organizer or leader, the defendant must have exercised some degree of control over others in the commission of the offense." *United States v. Helbling*, 209 F.3d 226, 243 (3d Cir. 2000) (internal quotation marks and citation omitted).

The Government's burden to establish organizer or leadership is not onerous. The enhancement applies any time a defendant exercises "some degree of control over others involved in the offense." *United States v. Chau,* 293 F.3d 96, 103 (3d Cir. 2002). The defendant does not have to control all of the participants **but only one of them**. *United States v. Bethancourt,* 65 F.3d 1074, 1081 (3d Cir. 1995); see also *United States v. Cruz Camacho,* 137 F.3d 1220, 1224 (10th Cir. 1998) (The enhancement requires proof that five persons participated in the criminal venture and that the defendant exercised leadership control over at least one person). Thus, the prerequisites for the enhancement are multiple participants in the criminal activity and some differentiation in the participants' relative culpability, with the more culpable participants receiving the enhancement. *United States v. Katora,* 981 F.2d 1398, 1405 (3d Cir. 1992). Both of these elements are present here. Notably, § 3B1.1(a) does not require proof that Beckford controlled five or more participants, although he did. Beckford's criminal enterprise involved more than five participants. Indeed, it involved dozens. The participants included himself, Akee Miller, a/k/a "Mitch," Tyla Griffin, Kasey Sanchez, Mercedes Smith, Samantha Smart, Rahmel Wigfall, a/k/a "Inf," Shayna Colon Acosta, Giovanna Twyman, Kevin Jones, a/k/a "Hat," Howard Bell, a/k/a "Nitty," Sabrina Cleveland, Maurice Faulkner, a/k/a "Moe," and James Artis-Bryant, a/k/a "Church." All of these

participants were subordinate drug dealers for whom Beckford provided fentanyl pills for further distribution/sale to the end user, <u>or</u> acted on behalf of Beckford to electronically transmit cash to Beckford in Arizona on behalf of other participants, <u>or</u> received packages at their respective addresses on behalf of Beckford to be retrieved by other drug subordinates.

Beckford cannot dispute and seemingly admits that prior to their separation in early 2021, Tyla Griffin was a participant in his criminal enterprise.

Beckford cannot dispute and seemingly admits that Kasey Sanchez, Akee Miller, and Mercedes Smith were all participants in his criminal enterprise. The Government counts five, just in his admissions.

However, Beckford leads the Court to believe that his criminal enterprise ends with these participants. In fact, Beckford's cellular device, *i.e.* his "office," contained evidence of dozens of other participants who obtained fentanyl pills from Beckford's Arizona operation.[13] When confronted with this evidence, Beckford did not deny the extensive nature of his criminal activity or the number of participants involved. The same evidence cannot be disputed now. Moreover, it was Beckford who controlled the price per pill.

---

[13] All of the participants identified by the Government have been criminally charged in the Middle District of Pennsylvania for their role in Beckford's criminal enterprise.

He set the price according to the quantity of pills purchased by the participant.  It was Beckford who recruited accomplices to assist him in his criminal conduct.  Beckford enjoyed the larger share of the fruits from the criminal enterprise.  Indeed, Beckford admittedly enjoyed upwards of $40,000 flowing through his various bank accounts each month.  Beckford controlled the manner of delivery and the timing of the deliveries via the U.S. Postal Service.  Beckford set the protocol for the enterprise – confirmation of cash transmittal first and then mailing of the drugs.

Beckford utilized a variety of user names for purposes of the money service applications, including "Gimme Mines," "Justin Case," and "Game Changer."  For Zelle electronic cash transmissions, Beckford used the name, "MillionaireMindsetEnt."  By way of example, the Government provides some snippets of Beckford's drug enterprise.  All of the below electronic cash transmittal activity represents cash payments from Beckford's subordinates for hundreds and/or thousands of fentanyl pills:[14]

---

[14]  From time to time, Beckford's subordinates attempted to disguise the purpose of the cash transmissions by falsely identifying the purpose as rent, car payment, food service, etc.

Cash App Transaction – between 09/20/2020 – 06/22/2021
Cash App account "MOE" to Beckford's Cash App accounts "Justin Case" and "Gimme Mines" Totaling $14,901.00

**Maurice Faulkner a/k/a "Moe"**

| Date | Status | | Total | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|---|
| 2020-09-29 16:54:51 UTC | PAID_OUT | USD | $1.00 | | Moe | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-09-30 00:06:27 UTC | PAID_OUT | USD | $1,000.00 | | Moe | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-10-16 20:56:06 UTC | DECLINED | USD | $900.00 | | Moe | 4435890103092632 | Paying | Gimme Mines | N/A | APP |
| 2020-10-16 21:05:28 UTC | PAID_OUT | USD | $900.00 | | Moe | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-10-31 05:29:19 UTC | PAID_OUT | USD | $1,000.00 | | Moe | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-11-06 03:12:07 UTC | PAID_OUT | USD | $1,000.00 | | Moe | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2021-02-11 02:07:37 UTC | EXPIRED_WAITING_ON_SENDER | USD | $1,400.00 | | Moe | N/A | Paying | Justin Case | N/A | APP |
| 2021-02-11 02:16:47 UTC | PAID_OUT | USD | $1,400.00 | | Moe | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-13 01:48:26 UTC | PAID_OUT | USD | $1,800.00 | | Moe | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-23 01:29:01 UTC | PAID_OUT | USD | $2,000.00 | | Moe | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-23 12:40:06 UTC | PAID_OUT | USD | $500.00 | | Moe | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-22 00:18:06 UTC | PAID_OUT | USD | $3,000.00 | | Moe | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |

# Cash App from Wigfall to "Justin Case"

**Rahmel Wigfall a/k/a "Inf"**

| Date | Status | Total | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source |
|---|---|---|---|---|---|---|---|---|
| 2021-07-19 10:59:01 UTC | PAID_OUT | USD | $1,000.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-07-09 19:28:54 UTC | PAID_OUT | USD | $1,000.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-06-30 16:14:29 UTC | PAID_OUT | USD | $1,000.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-06-29 02:03:18 UTC | PAID_OUT | USD | $1,500.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-06-26 18:32:42 UTC | PAID_OUT | USD | $500.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-06-13 18:44:08 UTC | PAID_OUT | USD | $2,000.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-06-02 15:55:54 UTC | PAID_OUT | USD | $100.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| 2021-05-18 18:16:20 UTC | PAID_OUT | USD | $200.00 | Rahmel Wigfall | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE APP |
| | | | $7,300.00 | | | | | |

## Zelle payments from Wigfall to Beckford $15,250.00

**Rahmel Wigfall a/k/a "Inf"**

| TRANSACTION DATE | PAYMENT ID | SENDING BANK NAME | SENDER NAME | RECEIVING BANK NAME | RECIPIENT PROFILE ID | BUSINESS NAME | RECIPIENT FIRST NAME | RECIPIENT LAST NAME | RECIPIENT TOKEN | PAYMENT STATUS | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/20/2021 | 02:12:14 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $400.00 |
| 5/5/2021 | 15c:16;01 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 5/6/2021 | 11c31c12 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $750.00 |
| 5/18/2021 | 18c18:33 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $8.00 |
| 5/18/2021 | 18C19C42 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $750.00 |
| 5/29/2021 | 92C18C18 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 5/28/2021 | 21c14c49 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 5/17/2021 | 04C09C46 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 6/2/2021 | 17c52c00 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $400.00 |
| 6/6/2021 | 23:51:45 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $900.00 |
| 6/9/2021 | 02:25:49 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 7/6/2021 | 19:26:50 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 8/4/2021 | 20:25:54 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,000.00 |
| 11/8/2021 | 22c11c09 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $1,000.00 |
| 11/11/2021 | 20C58C11 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $1,000.00 |
| 11/30/2021 | 00c45c01 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $1,000.00 |
| 1/14/2022 | 03:14:47 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $500.00 |
| 1/27/2022 | 15C39C13 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $500.00 |
| 1/30/2022 | 22C40C43 | PNC Bank, National Association | RAHMEL WIGFALL | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $500.00 |

## 7 Cash App Transactions from Twyman to Justin Case – $9,070.00 - 2/13/2021-7/16/2021

**Giavanna Twyman**

| Date | Status | Total | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|
| 2021-07-16 19:21:03 UTC | PAID_OUT AMOUNT_EXCEEDED_WE | USD | $1,400.00 vacation | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-18 00:49:36 UTC | EKLY_TRANSACTION_LIMI | USD | $1,300.00 rent | Giavanna Twyman | N/A | Paying | Justin Case | N/A | APP |
| 2021-06-11 17:13:55 UTC | PAID_OUT | USD | $1,320.00 happy birthday | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-21 01:30:24 UTC | PAID_OUT | USD | $1,300.00 vacation | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-01 16:27:13 UTC | PAID_OUT | USD | $1,300.00 sneakers & clothes | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-05 18:27:25 UTC | PAID_OUT | USD | $1,100.00 rent / bills | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-08 17:28:17 UTC | PAID_OUT | USD | $1,150.00 happy birthday | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-13 19:42:08 UTC | PAID_OUT | USD | $1,500.00 happy Valentine's Day | Giavanna Twyman | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| | | | $10,370.00 | | | | | | |

# 8 Zelle transactions from Twyman to Beckford $8,817 —June 2021 - January 2022

**Giavanna Twyman**

| TRANSACTION DATE | | PAYMENT ID | SENDING BANK NAME | SENDER NAME | RECEIVING BANK NAME | RECIPIENT PROFILE ID | BUSINESS NAME | RECIPIEN | RECIPIENT LAST NAME | RECIPIENT TOKEN | PAYMENT STATUS | PAYMENT AMOUNT | PAYMENT MEMO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/6/2021 | 06:35:27 | JPM671606921 | Chase | FREDDIE HALL | Bank of America | 15494674195 90727830 | | HOWARD | BELL | 15709522028 | DELIVERED | $40.00 | |
| 12/26/2021 | 01:17:12 | MNT0pM6ac0LM | M&T Bank | GIAVANNA TWYMAN | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $650.00 | Merry christmas |
| 1/25/2022 | 21:50:35 | MNT9ppztb2n8 | M&T Bank | GIAVANNA TWYMAN | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $650.00 | For rent |
| 11/17/2021 | 02:02:06 | MNTEgV9hzLSu | M&T Bank | GIAVANNA TWYMAN | Chase | 663363420 | | DAVON | BECKFORD | 16468757718 | DELIVERED | $1,000.00 | Vacation |
| 7/25/2021 | 19:34:18 | MNTRIL9tVMka | M&T Bank | GIAVANNA TWYMAN | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $500.00 | Kids |
| 6/18/2021 | 01:07:19 | MNTjFewW7M5 c | M&T Bank | GIAVANNA TWYMAN | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,280.00 | Vaction |
| 8/2/2021 | 00:44:25 | MNTQIoVVPR1h | M&T Bank | GIAVANNA TWYMAN | Chase | 628167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $1,737.00 | Vacation |
| 9/9/2021 | 18C48C05 | MNTYddOP009a | M&T Bank | GIAVANNA TWYMAN | Chase | 655454048 | | DAVON | | BECKFORD dolomosthated5@gm ail .com | DELIVERED | $1,500.00 | Vac tion |
| 8/29/2021 | 18:50:23 | MNTIV9EnaDaZ | M&T Bank | GIAVANNA TWYMAN | Chase | 655454048 | | DAVON | BECKFORD | dolomosthated5@gm ail .com | DELIVERED | $1,500.00 | Vacation |

**Kevin Jones a/k/a "Hat"**

| Date | Status | Total | | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021-06-25 21:22:37 | PAID_OUT | USD | $2,450.00 | | HAT | 4294200674175610 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-24 18:06:31 | PAID_OUT | USD | $2,500.00 | leather jacket | HAT | 4294200674175610 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-06 03:25:57 | PAID_OUT | USD | $1,000.00 | | HAT | 4294200674175610 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-05 16:55:18 | PAID_OUT | USD | $2,000.00 | | HAT | 4294200674175610 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-28 00:33:13 | PAID_OUT | USD | $1,250.00 | | HAT | 4294200674175610 | Request | Justin Case | CASH_BALANCE | APP |
| | | | | | | | | | | |
| | | | $9,200.00 | | | | | | | |

## Cash App Transactions from "Hat" to Justin Case

## 17 Cash App transactions between Sabrina and Justin case 03/17/2021 -05/26/2021  - $20,975



| Date | Status | Total | | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021-03-17 19:11:03 UTC | DECLINED | USD | $700.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-03-17 19:26:00 UTC | PAID_OUT | USD | $350.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-17 19:26:21 UTC | DECLINED | USD | $350.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-03-17 19:26:53 UTC | DECLINED | USD | $250.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-03-18 01:31:45 UTC | DECLINED | USD | $350.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-03-18 11:11:14 UTC | PAID_OUT | USD | $350.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-22 12:53:30 UTC | PAID_OUT | USD | $700.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-30 18:58:07 UTC | PAID_OUT | USD | $700.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-09 20:43:20 UTC | PAID_OUT | USD | $500.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-10 14:16:35 UTC | PAID_OUT | USD | $200.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-14 17:27:33 UTC | PAID_OUT | USD | $700.00 | | Sabrina | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-17 00:12:20 UTC | PAID_OUT | USD | $700.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-19 19:37:44 UTC | PAID_OUT | USD | $700.00 | hat | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-24 01:30:29 UTC | PAID_OUT | USD | $700.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-29 15:01:05 UTC | PAID_OUT | USD | $700.00 | hat | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-01 02:44:09 UTC | DECLINED | USD | $1,800.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-01 02:44:39 UTC | PAID_OUT | USD | $1,000.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-01 02:48:32 UTC | DECLINED | USD | $800.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-01 14:12:56 UTC | DECLINED | USD | $800.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-01 14:13:20 UTC | PAID_OUT | USD | $400.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-01 14:40:43 UTC | DECLINED | USD | $800.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-01 14:50:12 UTC | PAID_OUT | USD | $400.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-01 14:52:20 UTC | DECLINED | USD | $400.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-01 16:05:21 UTC | PAID_OUT | USD | $400.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-04 21:21:56 UTC | PAID_OUT | USD | $1,975.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-05-26 12:09:02 UTC | DECLINED | USD | $1,250.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-26 12:09:32 UTC | DECLINED | USD | $1,000.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-26 12:09:51 UTC | DECLINED | USD | $750.00 | | Sabrina | 5446460001725826 | Paying | Justin Case | N/A | APP |
| 2021-05-26 12:12:45 UTC | PAID_OUT | USD | $1,000.00 | | Sabrina | 5129925099494364 | Paying | Justin Case | N/A | APP |
| 2021-05-26 12:12:59 UTC | PAID_OUT | USD | $250.00 | | Sabrina | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| | | | $20,975.00 | | | | | | | |

## Cash App Transactions from Smart to Justin Case

**Samantha Smart**

| Date | Status | Total | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|
| 2021-01-12 16:10:08 UTC | AUTOMATICALLY_BLOCKED | USD | $700.00 rental | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-01-12 16:13:45 UTC | AUTOMATICALLY_BLOCKED | USD | $700.00 rent | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-01-20 11:13:35 UTC | PAID_OUT | USD | $600.00 car payment | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-01-21 23:36:53 UTC | PAID_OUT | USD | $100.00 masks | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-04 20:11:49 UTC | R   -   -   - | USD | $700.00 game | Samantha Smart | N/A | Paying | Justin Case | N/A | APP |
| 2021-02-04 20:12:26 UTC | R   -   -   - | USD | $700.00 game | Samantha Smart | N/A | Paying | Justin Case | N/A | APP |
| 2021-02-04 20:13:14 UTC | R | USD | $700.00 game | Samantha Smart | N/A | Paying | Justin Case | N/A | APP |
| 2021-02-04 20:18:09 UTC | PAID_OUT | USD | $700.00 game | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-13 22:02:22 UTC | PAID_OUT | USD | $100.00 sending more | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-13 23:31:09 UTC | PAID_OUT | USD | $200.00 thank me | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-17 15:01:01 UTC | DECLINED | USD | $300.00 food | Samantha Smart | 4737028045079202 | Paying | Justin Case | N/A | APP |
| 2021-02-17 15:03:26 UTC | PAID_OUT | USD | $250.00 food | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-02-25 03:03:06 UTC | PAID_OUT | USD | $50.00 food balance | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-06 00:56:53 UTC | PAID_OUT | USD | $100.00 busy person | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-12 17:33:27 UTC | PAID_OUT | USD | $700.00 food | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-03-29 18:29:55 UTC | PAID_OUT | USD | $700.00 supplies | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-06 02:41:33 UTC | DECLINED | USD | $600.00 rent | Samantha Smart | 4737028045079202 | Paying | Justin Case | N/A | APP |
| 2021-04-06 02:42:23 UTC | PAID_OUT | USD | $450.00 rent | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-06 12:44:03 UTC | PAID_OUT | USD | $150.00 rent | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-07 00:10:38 UTC | PAID_OUT | USD | $50.00 | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-09 20:05:51 UTC | PAID_OUT | USD | $50.00 attitude sir | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-17 19:19:17 UTC | PAID_OUT | USD | $600.00 amazon | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-04-20 21:59:54 UTC | PAID_OUT | USD | $100.00 I'm vex | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-05 04:10:58 UTC | PAID_OUT | USD | $700.00 | Samantha Smart | 4737028045079202 | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-06-23 20:54:46 UTC | PAID_OUT | USD | $600.00 curry | Samantha Smart | CASH_BALANCE | Paying | Justin Case | CASH_BALANCE | APP |
| 2021-07-06 02:46:44 UTC | AUTOMATICALLY_BLOCKED | USD | $639.00 wholesale gal Dem☺☺ | Samantha Smart | 4737028045575712 | Paying | Justin Case | CASH_BALANCE | APP |
| | | | $11,239.00 | | | | | | |

# Zelle Transactions from Smart to Beckford
## 07/05/2021 – 10/08/2021

**Samantha Smart**

| TRANSACTION DATE | | PAYMENT ID | SENDING BANK NAME | SENDER NAME | RECEIVING BANK NAME | RECIPIENT PROFILE ID | BUSINESS NAME | RECIPIENT FIRST NAME | RECIPIENT LAST NAME | RECIPIENT TOKEN | PAYMENT STATUS | PAYMENT AMOUNT | PAYMENT MEMO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/2022 | 17C37C14 | WFCT0O995ZIU | Wells Fargo | RASHEETA LUNDY | Bank of America | 50054410240414B4043 | FEATURES FILM & PHOTOGRAPHY LLC | | | 15709522026 | DELIVERED | $2,500.00 | |
| 7/5/2021 | 16:08:10 | WFCT0BKL26TY | Wells Fargo | SAMANTHA SMART | Chase | 928167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $250.00 | |
| 1/12/2021 | 16:58:48 | WFCT09M5VCGP | Wells Fargo | SAMANTHA SMART | Chase | 928167505 | | DAVON | BECKFORD | 17739312530 | DELIVERED | $500.00 | |
| 10/4/2021 | 21:20:09 | WFCT0CKD4YW4 | Wells Fargo | SAMANTHA SMART | Chase | 655494048 | | DAVON | BECKFORD | dolomosthate6@gma com | DELIVERED | $100.00 | |
| 9/23/2021 | 20C20C54 | WFCT0CGR6YQH | Wells Fargo | SAMANTHA SMART | Chase | 655494048 | | DAVON | BECKFORD | dolomosthate6@gma com | DELIVERED | $650.00 | |
| 10/8/2021 | 02:10:33 | WFCT0CL3KKPF | Wells Fargo | SAMANTHA SMART | Chase | 655494048 | | DAVON | BECKFORD | dolomosthate6@gma com | DELIVERED | $650.00 | |

**Howard Bell a/k/a "Nitty"**

| Date | Status | Total | | Subject | Sender | Sndr. Source | Action | Recipient | Rcpt. Source | Client |
|---|---|---|---|---|---|---|---|---|---|---|
| 2020-05-29 23:17:06 UTC | PAID_OUT | USD | $500.00 | | Nitti | 4117737006694250 | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-08-11 19:44:42 UTC | PAID_OUT | USD | $70.00 | | NiNi | 4168328989248559 | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-09-14 22:29:08 UTC | PAID_OUT | USD | $20.00 | | Nitti | 4117737006694250 | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-08 19:56:01 UTC | PAID_OUT | USD | $980.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-11 01:29:58 UTC | PAID_OUT | USD | $10.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-11 20:01:13 UTC | PAID_OUT | USD | $280.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-11 23:24:30 UTC | PAID_OUT | USD | $200.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-14 04:14:17 UTC | PAID_OUT | USD | $65.00 | | Nitti | 4117737009969535 | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-14 23:44:19 UTC | PAID_OUT | USD | $27.00 | | Nitti | 4117737009969535 | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-18 18:11:58 UTC | PAID_OUT | USD | $280.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-22 02:35:09 UTC | PAID_OUT | USD | $870.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-22 05:34:22 UTC | PAID_OUT | USD | $50.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-22 20:20:57 UTC | PAID_OUT | USD | $20.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-28 21:14:12 UTC | PAID_OUT | USD | $750.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-29 16:05:43 UTC | PAID_OUT | USD | $64.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2020-12-29 17:49:01 UTC | PAID_OUT | USD | $15.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | CASH_BALANCE | APP |
| 2021-01-01 17:25:51 UTC | RECIPIENT_BLACKLISTED | USD | $700.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | N/A | APP |
| 2021-01-01 17:26:24 UTC | RECIPIENT_BLACKLISTED | USD | $700.00 | | Nitti | CASH_BALANCE | Paying | Gimme Mines | N/A | APP |
| 2021-03-05 06:55:49 UTC | PAID_OUT | USD | $25.00 | | Nitti | CASH_BALANCE | Request | Justin Case | CASH_BALANCE | APP |
| 2021-03-31 19:30:13 UTC | PAID_OUT | USD | $400.00 | | Nitti | CASH_BALANCE | Request | Justin Case | CASH_BALANCE | APP |
| 2021-04-03 22:30:40 UTC | PAID_OUT | USD | $300.00 | | Nitti | 4117737011643508 | Request | Justin Case | CASH_BALANCE | APP |
| | | | $6,326.00 | | | | | | | |

All of the above and more were participants in Beckford's extensive criminal enterprise. (*See* MDPA 3:CR-23-26). He cannot credibly dispute the same. Beckford is the poster child for the 4-level enhancement pursuant to § 3B1.1.

### C. Beckford's Prior New York Violent Felony Conviction for Armed Robbery of the First Degree Qualifies as a Crime of Violence for Career Offender Purposes

On October 21, 2011, Beckford and another male robbed a man as the victim walked home from a train station in New York City. The victim reported to New York City police officers that a black male displayed a black firearm and said, "You already know what's the deal." A second black male walked up from behind the victim and displayed a knife. Both males proceeded to rob the victim of his computer, money, wallet, headphones, and then fled the scene. Both males were quickly apprehended by law enforcement. Court records indicate that it was Beckford who possessed the firearm during the robbery. (*See* Attachment A, p. 29, 33 – filed under seal) Beckford was prosecuted as an adult in Queens County in the Supreme Court of New York. An indictment was returned against him on November 10, 2011, which charged him with multiple felony offenses including first degree robbery and criminal possession of a weapon. Beckford pleaded guilty to "Robbery by Force with a Deadly Weapon, a New York Class B Felony punishable by a term of imprisonment exceeding one year.[15] *Id.*

---

[15] It is not a matter of dispute that the New York crime of robbery in the 1st degree is punishable by imprisonment for more than a year. It is classified as a "Class B Felony" carrying a potential prison sentence of 25 years. *See* N.Y. Penal Law, §§ 160.15 and 70.00. It also cannot be disputed that Beckford's robbery conviction was classified as an adult conviction under the laws of New York even though he was 17 years old when arrested and 18

During a presentence interview for that crime, Beckford reported that he was reared by his parents and that he enjoyed a good childhood. He reported positive relationships with family members. He reported no psychological problems. Although he committed this violent crime at the age of 17, Beckford was 18 years old at the time of sentencing. Court records indicate that this 1st degree armed robbery was not his first arrest in New York. The New York City Department of Probation recommended that Beckford be designated a youthful offender, although the reasoning for the same is not entirely clear. Notably, the same New York City Department of Probation advised the court that "jail is strongly recommended," and that Beckford's, "violent, aggressive actions towards the victim placed him in

---

when convicted. Under New York law, only those defendants under the age of 16 are potentially relieved of adult criminal liability and entitled to have their proceedings handled by the New York family courts. *See* N.Y. Penal Law, § 30.00; N.Y. Crim. Proc. Law, § 180.75; N.Y. Fam. Ct. §301.2. Under the above statutory scheme, since Beckford was 17 at the time of the robbery in question, he entered the New York penal system as an adult (in the Queens County, NY Supreme Court) and was convicted as such. Under New York law, convicted offenders aged sixteen through eighteen who meet certain criteria may receive a youthful offender adjudication and certain benefits that go along with it, including the vacation of their underlying conviction. *See* N.Y. Crim. Proc. Law, § 720.10. In order to qualify as a "youthful offender," however, there must first exist that underlying adult conviction. *See* N.Y. Crim. Proc. Law, §720.10, and *United States v. Jones,* 415 F.3d 256, 264 (2d Cir. 2005) ("Under New York law, a conviction is a prerequisite to a youthful offender adjudication.")

grave danger." The Probation Officer continued on to state, "The defendant committed this offense without regard to the victim's safety or the possible legal consequences. He is a threat to the safety of others. Consequently for the protection of the community a term of incarceration is recommended. An order of protection should remain in effect." (*See* Attachment A, p. 37 – filed under seal).

On April 15, 2013, Beckford was sentenced in the Supreme Court of New York to a five year term of probation. (*See* Attachment A, p. 30 – filed under seal). Beckford did not successfully complete the term of probation. It was revoked on April 28, 2016 when he committed the federal drug trafficking crime docketed at 3:CR-16-127.[16] PSR ¶43.

Beckford now disputes the fact that his previous conviction for first degree armed robbery qualifies as a "conviction" at all, much less a crime of violence for career offender purposes. (Doc. 150, p. 7). Beckford argues that it is not a conviction because he was ultimately afforded youthful offender status. Beckford offers no credible support for his claim because it is

---

[16] Notably, in Beckford's PSR prepared in connection with his 2016 federal drug trafficking crime, his prior conviction for Armed Robbery of the First Degree was awarded 3 criminal history points and treated as the felony violent crime conviction it continues to be. (3:CR-16-127, Doc. 113, ¶27).

unsupportable.  In fact, his first degree armed robbery qualifies as both a felony conviction and a conviction for a crime of violence.[17]

It is initially noted that the Second Circuit itself has already decided this issue.  The Second circuit has held that a district court may consider youthful offender adjudications when calculating a defendant's criminal history category under  U.S.S.G. § 4A1.1.  *See  United States v. Driskell,* 277 F.3d 150, 154 (2d Cir. 2001) (defendant's prior state conviction of attempted murder in the second degree could be considered by court in calculating sentence for defendant's crime of possession of a firearm by a convicted felon, even  though  the  prior  crime  was committed when defendant was 17 and even though defendant was subsequently adjudicated a youthful offender under New York State law); *United States v. Reinoso,* 350 F.3d 51, 54 (2d Cir.2003) (defendant's prior state conviction for armed robbery could be considered in calculating his offense level for illegal reentry conviction as subsequent youthful offender adjudication did not expunge the conviction or otherwise absolve defendant of criminal responsibility for the robbery); and

---

[17]    The Career Offender Guidelines require a defendant to have two or more qualifying "convictions" for crimes of violence or controlled substance offenses.  U.S.S.G. § 4B1.1(a).  Per the application notes, a "conviction" includes an offense committed prior to the age of eighteen….if it is classified as an adult conviction under the law of the jurisdiction in which the defendant was convicted."  U.S.S.G. § 4B1.2, appl. Note 1.

*United States v. Cuello,* 357 F.3d 162, 168-69 (2d Cir. 2004) (16-year-old's youthful offender adjudication under New York State law counted as a prior adult conviction in determining base offense level under Sentencing guidelines for weapons convictions).

In *United States v. Jones*, 415 F.3d 256, 263-64 (2d Cir. 2005), the Court applied the clear language of the career offender guidelines, U.S.S.G. §§ 4B1.1 and 4B1.2, and the accompanying Commentary, and held that two youthful offender adjudications for crimes committed before the defendant turned eighteen qualified as "prior felony convictions" for purposes of the Career Offender Guideline, because, after examining the substance of the proceedings, they could be considered "classified" as adult convictions. *Id.*

In *United States v. Parnell*, 524 F.3d 166, 171 (2d Cir. 2008), the defendant was eighteen when he committed the offense that resulted in a conviction for attempted second degree burglary, for which he was later adjudicated as a youthful offender. The Court held that because that conviction was punishable by up to seven years' imprisonment, it clearly qualified as a "prior felony conviction," that was an "adult conviction" "punishable by ….imprisonment for a term exceeding one year." The Court held that the District Court did not err when it included the youthful offender adjudication in Parnell's Career Offender calculation. *Id.* at 171.

In similar fashion, the Third Circuit has already decided this issue. In cases specifically addressing the applicability of New York youthful offender convictions under the Sentencing Guidelines, the Third Circuit affirmed the district courts' reliance on the New York youthful offender adjudications in making Guideline determinations concerning the defendants' criminal histories. *See United States v. Wright*, 109 F. App'x 510, 511-512 (3d Cir. 2004) and *United States v. Wallace*, 663 F.3d 177, 181 (3d Cir. 2011); s*ee also, United States v. Allen* 208 F. App'x. 189, 191 (2006) (defendant's prior conviction for aggravated assault constituted predicate felony for purposes of sentencing under career offender guidelines despite fact that he was under age 18 at time of that prior conviction).

Notably, in *Wallace*, the Third Circuit specifically rejected the Second Circuit's requirement that the defendant receive and serve a sentence exceeding one year and one month in an adult prison. *Id*. at 181. The Court noted that, pursuant to Third Circuit precedent, the length of the sentence and the type of facility where it was served are irrelevant. *Id*.
In *Wallace,* the Court plainly noted that § 4B1.2 dictates that the career offender inquiry examine only whether the convictions in question are adult convictions, and not what kind of sentences resulted from those convictions. *United States v. Moorer,* 383 F.3d 164, 168 (3d Cir.2004). In *Moorer,* the defendant-appellant was convicted of drug offenses and classified as a career

offender because of two prior felony convictions. *Id.* at 166. Moorer argued that one of the prior convictions should not be counted because he was sentenced as a juvenile, not as an adult. *Id.* at 167. The Third Circuit stated "the Guidelines belie Moorer's premise that an adult conviction must be accompanied by an adult sentence to count toward career offender status." *Id.* This was because the language in Note 1 of the Commentary to § 4B1.2 specifically states that a "prior felony conviction" is determined by courts "regardless of the actual sentence imposed." *Id.* "[W]here or how long the defendant is *actually* sentenced is of no import." *Id.* The Guidelines as of 2023 continue to belie Moorer's premise.[18]

The Court in *Wallace* concluded that the four-element inquiry advocated by the defendant in that case would similarly contradict the Commentary to § 4B1.2. The fourth element of the inquiry requires the defendant to have served a sentence exceeding one year and one month in an adult prison.[19] "But as this Court held in *Moorer,* Note 1 of the Commentary

---

[18]  Pursuant to §4B1.2(e)(4) and career offender purposes, "A Prior Felony conviction" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed. U.S. Sentencing Commission Guidelines Manual 2023.

[19]  The defendant in *Wallace* served only a four month sentence in a non-adult facility. *Wallace* 663 F.3d at 179.

to § 4B1.2 specifically states that a "prior felony conviction" is determined by courts "regardless of the actual sentence imposed." *Moorer,* 383 F.3d at 167." *Wallace*, 663 F.3d at 181. Wallace's proposed analysis thus contravened Third Circuit precedent, as well as the language of the Guidelines, which remain consistent today, because the length of the sentence and the type of facility where it is served are irrelevant. *Id.*

In similar fashion, Beckford's argument contravenes Third Circuit precedent. He offers nothing to support a contrary conclusion. His New York First Degree Armed Robbery conviction is properly calculated in the guideline calculations and properly considered a "crime of violence" for career offender purposes.[20] As stated above, Beckford was not only convicted of a crime

---

[20]     The terms "crime of violence" and "controlled substance offense" are defined as follows in § 4B1.2:
> (a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, **robbery**, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

*See, United States v. Pereira–Gomez*, 903 F.3d 155 (2d Cir. 2018) (except for attempted robbery in the second degree, all other New York robbery offenses qualify as crimes of violence under the elements clause); *United States v. Ojeda*, 951 F.3d 66, 70–72 (2d Cir. 2020) (any degree of robbery under New York law is an ACCA violent felony); *Stuckey v. United States*, 878 F.3d 62 (2d Cir. 2017) (first–degree robbery in New York, N.Y. Penal Law § 160.15, is

35

punishable by a term of imprisonment exceeding one year, he was convicted of a violent crime involving a deadly weapon. The New York Probation Department strongly recommended a sentence of imprisonment for Beckford and noted strong concerns for the safety of the community and, in particular, the victim of Beckford's violent crime. (*See* Attachment A, p. 37 – filed under seal).

It is clear, therefore, pursuant to Third Circuit precedent, that Beckford's youthful offender conviction is properly counted under the sentencing guidelines and properly included in the determination that Beckford is properly designated a career offender.

## III.   Conclusion

For the above stated reasons, all of Beckford's objections to the PSR should be denied in their entirety.

<div style="margin-left: 40%;">

Respectfully submitted,

GERARD M. KARAM
United States Attorney


/s/ Michelle L. Olshefski
MICHELLE L. OLSHEFKI
Assistant U.S. Attorney
</div>

Date: January 18, 2024

---

a violent crime under ACCA); *accord Lassend v. United States*, 898 F.3d 115, 128 (1st Cir. 2018); *United States v. Hammond*, 912 F.3d 650 (4th Cir. 2019); *United States v. Sanchez*, 940 F.3d 526, 531–33 (11th Cir. 2019).

## Word Count

Counsel for the government hereby certifies that the word count of this brief is 7,669 words.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | No. 3:CR-22-061-01 |
| | : | |
| v. | : | (Judge Mariani) |
| | : | |
| DAVON ANTHONY BECKFORD, | : | (Electronically Filed) |
| a/k/a "Dolo," a/k/a "Jaquan Wilson," | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on January 18, 2024, she served a copy of the attached:

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PSR

by electronic filing on the following:

Christopher Opiel, Esquire

/s/ Michelle Olshefski
Michelle Olshefski
Assistant U.S. Attorney